UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KIMBERLY COLPEAN,

    PLAINTIFF,

v.                                                          CASE NO. 05-73710

AJILON, L.L.C.,                              HONORABLE SEAN F. COX

    DEFENDANT.
_____/

**OPINION & ORDER**

    Plaintiff Kimberly Colpean ("Plaintiff") filed this action on September 28, 2005, against her former employer, Ajilon L.L.C. ("Defendant"), asserting the following two counts: "Violation of the Family and Medical Leave Act, 29 U.S.C. §2601 *et seq*." (Count I) and "Sex Discrimination in Violation of the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq*." (Count II). The matter is currently before the Court on Defendant's Motion for Summary Judgment. The Court heard oral argument on March 29, 2007. For the reasons below, Defendant's motion shall be GRANTED and this action shall be dismissed with prejudice.

BACKGROUND

    Defendant is a provider of consulting services specializing in information technology business solutions. It provides temporary employees to its clients.

    Plaintiff sought employment with Defendant in November, 2000, after being referred to Defendant by Bob Brady ("Brady"), an employee of Defendant. (Ex. 1 to Def.'s Br.). Plaintiff's application for employment with Defendant indicated that she had a 3.8 grade point average from

Oakland Community College and a 3.8 grade point average from Oakland University, when in fact she her grade point averages were lower. (*Id.;* Pl.'s Dep. at 19-20; Def.'s Exs. 13 & 14). The application, signed by Plaintiff, stated "I understand that any agreement of employment entered into between Ajilon and myself is predicated upon the truthfulness of the statements herein contained" and that "It is understood and agreed that any misstatement made by me in this application would be sufficient cause for discharge." (Ex. 1 to Def.'s Br.).

Plaintiff was offered a position with Defendant in August, 2001. (Ex. 3 to Def.'s Br.). The written offer of employment, signed and agreed to by Plaintiff, stated: "During the course of your employment, you agree to devote your full time and attention to the business of [Defendant.]" (*Id*.). It also stated, "Due to the competitive nature of our business, we require that you not become involved in any outside business opportunities in which [Defendant] is then involved or may care to pursue. Any potential conflict of interest should be cleared in writing and in advance with [Defendant's] management." (*Id*.).[1]

When she started work for Defendant in August, 2001, Defendant placed her at an assignment for Defendant's client Daimler Chrysler ("DC"). (Pl.'s Dep. at 22). DC employee Jerry Roek ("Roek") was her supervisor on that assignment. Two other employees of Defendant, Brady and Prasad Cody ("Cody") were also working on assignments at DC and worked for Roek on Lotus Notes Development work. (*Id*. at 23-34).

While employed by Defendant, Plaintiff got married in 2002, and later became pregnant, with her child due to born on September 24, 2003. Plaintiff planned on taking twelve weeks of

---

[1] Plaintiff again agreed to those same terms and conditions of employment on February 6, 2002, when her compensation changed. (Ex. 4 to Def.'s Br.).

2

maternity leave and states that she began discussing transitioning job responsibilities relating to her leave at the end of July or beginning of August, 2003.  (*Id.* at 27-28).

On August 18, 2003, Plaintiff attended a meeting at which Roek stated that he was going to need to eliminate three positions in his division in order to meet his budget numbers for the year.  (*Id.* at 28-29).  Plaintiff states that Roek did not tell her that she was being let go, but that:

> I was told that since I was going on maternity leave that I was going to be one of
> the ones to be – or I was going to be asked to take my maternity leave early,
> because at that point I had planned on taking twelve weeks of maternity leave
> which would have been put me through the end of 2003.

(*Id*. at 29-31).  Plaintiff acknowledges that during that August 18th meeting, Roek told Plaintiff that the end date for her assignment at DC would be the end of August because he was cutting head count.  (*Id*. at 32-33).

Defendant's representative Walter Kulik ("Kulik") testified that on August 18, 2003, DC informed Defendant that DC was reducing head count and that Plaintiff's position was one that was going to be cut.  (Kulik Dep. at 35).  Kulik states that Roek made the decision to eliminate Plaintiff to reduce headcount at DC and that Roek explained that he had selected Plaintiff for the reduction because she was the least experienced of the three contract employees and that Brady and Cody were working on crucial projects, while Plaintiff's projects could be dispersed among others.  (*Id.* at 71).  He also testified that there was some discussion that Plaintiff might be brought back by DC in the beginning of the next year, 2004.  (Kulik Dep. at 35 & 72).  Because Kulik was under the impression that DC may request that Plaintiff may go back on assignment to DC in 2004, he did not actively pursue placing her with another client during her maternity leave. (*Id*. at 34-25).

After her assignment at DC ended at the end of August, 2003, Plaintiff was in a non-pay status, in that she was not on the bench,[2] and was not being paid by Defendant because she had no assignment. (Pl.'s Dep. at 37). She states that after her assignment at DC ended, there was a period of a week or two that she was available and able to take an assignment with another client, if Defendant had located one. (*Id*. at 36). Plaintiff testified that she was told that she could either "take leave without pay until [her] maternity leave started or [she] could take vacation time." (*Id*. at 37). She also testified that she had some paid days off ("PDOs") that she had accrued and that she used PDO days to cover the days when she did not have an assignment.

Plaintiff acknowledges that she had no assignment with DC during the month of September, 2003. (*Id*. at 36). At the March 29, 2007 hearing, counsel for Plaintiff stated that Plaintiff did not begin her maternity leave until September 23, 2003.

Plaintiff originally planned to be off work until the end of December, 2003. (*Id*. at 39). In November, 2003, however, Plaintiff contacted Kulik and indicated that she was ready to come back to work. (Pl.'s Dep. at 40). Plaintiff testified that during that conversation Kulik advised that there was no placement available for Plaintiff at DC, but that he called her again and said that Defendant wished to put her on the bench for a period of time because Defendant thought she had valuable skills and could be marketed to other clients. *(Id*. at 42-43).

Defendant sent a written "Employee Bench Notification" to Plaintiff on November 10, 2003. (Ex. 10 to Def.'s Motion). It is undisputed that Plaintiff received her regular pay until

---

[2] Being put on the bench means that although the employee is not actually working on an assignment with a client, he or she still receives his or her regular pay while Defendant tries to find a placement for that employee. (Pl.'s Dep. at 42-43).

4

Defendant took her off bench status and terminated her employment. (Pl.'s Dep. at 43).

Kulik testified that after Plaintiff advised that she wanted to come back to work, he tried to place her with DC again, without success, and then marketed Plaintiff to other clients. (Kulik Dep. at 73-76). Plaintiff states that she does not know if Kulik made efforts to place her with another client, but acknowledges that he had a financial incentive to do so. (Pl.'s Dep. at 51).

Unbeknownst to Defendant, while receiving bench pay from Defendant, Plaintiff began working for one of Defendant's competitors. On November 25, 2003, Trialon Corporation sent Plaintiff a letter extending an employment offer to her, with a "start date of 12/1/2003." (Ex. 11 to Def.'s Br.). Plaintiff signed the letter, indicating her acceptance of the employment offer, on November 26, 2003. (*Id*.) Plaintiff testified that her work for Trialon was full-time employment and consisted of a Lotus Notes Development assignment for DC. (Pl.'s Dep. at 9-10). Plaintiff acknowledges that she understood that during the period of time that she was employed with Defendant she could not work for anybody else, that she was obligated to notify Defendant if she began working for someone else, and that she began working for Trialon on November 26, 2003. (*Id*. at 44-48). Nevertheless, she never told Defendant that she had secured employment with Trialon. (*Id*.).

On December 17, 2003, Defendant sent Plaintiff a letter informing her that her employment would be terminated effective December 31, 2003. (Ex. 12 to Def.'s Br.). Plaintiff filed this action against Defendant on September 28, 2005.

5

Standard of Decision

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c). The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

## ANALYSIS

A.   Plaintiff's Sex Discrimination Claim:

Plaintiff alleges gender discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, M.C.L. 37.2101 *et seq.* ("the ELCRA"), which provides in relevant part that an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on her discrimination claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Here, Plaintiff does not assert that any direct evidence supports her sex discrimination

6

claim. She must therefore rely on circumstantial evidence.

Under the circumstantial evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Although originally created by federal courts for use in race discrimination cases, Michigan courts have adopted the *McDonnell Douglas* approach for use in gender discrimination cases brought under the ELCRA (s*ee Hazle v. Ford Motor*, 464 Mich. 456, 463 (2001)) and both parties acknowledge that framework applies to Plaintiff's claim.

Under the *McDonnell Douglas* framework, the initial burden is on the plaintiff to establish a prima facie claim of discrimination.

To sustain a discrimination claim under the ELCRA, a plaintiff must make her prima facie showing of discrimination either by establishing: 1) disparate treatment, or 2) intentional discrimination. *Marsh v. Department of Civil Service*, 173 Mich.App. 72, 79 (1989); *Singal v. General Motors Corp.*, 179 Mich.App. 497, 502-03 (1989); *Pitts v. Michael Miller Car Rental*, 942 F.2d 1067, 1070 (6th Cir. 1991).

"Under the former, the plaintiff must show that [s]he was a member of the affected class, that [s]he was discharged, and that the person who discharged h[er] was predisposed to discriminate against persons in the affected class and had actually acted on that predisposition in discharging [her]." *Singal,* 179 Mich. App. at 503; *Marsh*, 179 Mich. App. at 79.

"The latter requires a showing that the plaintiff was a member of the class entitled to protection under the act and that [s]he was treated differently than persons of a different class for the same or similar conduct." *Id.* In other words, in order to establish a prima facie case of sex

discrimination, "a woman must show that she was a member of a class entitled to protection under the statute and that, for the same or similar conduct, she was treated differently than a man. The crux of a sex discrimination case is that similarly situated persons have been treated differently because of their sex." *Marsh*, 173 Mich. App. at 79; *see also Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)(To be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have dealt with the same supervisor, have been subject to the same standards, and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them.)

Once a plaintiff establishes such a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. If the employer articulates such a reason, then the Plaintiff has the burden of establishing that the articulated reason is in reality a pretext to mask discrimination. *Skrjanc, supra.* A plaintiff establishes pretext by showing that the reason offered by the defendant: 1) has no basis in fact; 2) did not actually motivate the decision; or 3) was insufficient to warrant the decision. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Defendant asserts that it is entitled to summary judgment because: 1) Plaintiff cannot establish a prima facie claim of sex discrimination and 2) Defendant has articulated a legitimate, nondiscriminatory reason for her discharge and Plaintiff cannot show that reason was a pretext for discrimination.

Because Plaintiff's complaint appears to assert both disparate treatment and intentional discrimination, Defendant's motion contends that Plaintiff can establish neither type of prima

facie case.

As to intentional discrimination, Defendant asserts that Plaintiff cannot produce any evidence to show that Defendant was predisposed to discriminate on the basis of gender or that it actually acted on such a predisposition in terminating Plaintiff. Defendant asserts that the decision to terminate Plaintiff was made by Defendant's Vice President Tom McKenty and that he made the reason for purely financial reasons – basically that they were unable to place Plaintiff in another assignment and were losing money by keeping her on the bench. Thus, Defendant asserts that there is simply no evidence that any decision maker at Defendant was predisposed to discriminate against females or actually acted on any such predisposition in terminating Plaintiff.

As to disparate treatment, Defendant asserts that Plaintiff has no evidence that she was treated differently from any similarly situated male Lotus Notes Developer by Defendant. Defendant notes that DC, not Defendant, made the decision to eliminate Plaintiff's placement with DC. Moreover, Defendant notes that Plaintiff admits that DC advised that it had to eliminate three positions due to cutbacks, that she admits she was Defendant's least experienced Lotus Notes Developer placed with DC when her position was eliminated, that she had less seniority than the other Lotus Notes Developers placed at DC, and that the work she performed at DC was a different type of work than that performed by the others. Thus, Defendant asserts that Plaintiff was not similarly situated to either Brady or Kode.

Defendant also asserts that Plaintiff cannot establish that she was treated differently from any similarly situated male employee when her employment was eventually terminated by

Defendant on December 31, 2003.  It asserts that Plaintiff cannot identify any similarly situated employee whose employment on the bench was continued for seven weeks despite the fact that Defendant could not locate an assignment for that employee.

Thus, Defendant claims that Plaintiff cannot establish a prima facie case and it is therefore entitled to summary judgment.

In addition, Defendant claims that it has articulated a legitimate nondiscriminatory reason for its actions: 1) as to the end of her assignment at DC, it asserts that DC decided to terminate Plaintiff's placement there, not Defendant, and that Defendant cannot force its client to retain a contracted employee; 2) as to her termination by Defendant, it asserts that although it retained her on the bench with pay for several weeks while it tried to find an assignment for Plaintiff, it ultimately terminated her for financial reasons when it could not locate an assignment for her. Defendant asserts that Plaintiff has no evidence to establish that those reasons are a pretext for discrimination and it is therefore entitled to summary judgment on this alternative ground as well.

Plaintiff's response does not articulate which type of prima facie case she believes she can establish (disparate treatment or intentional discrimination) but appears to attempt to establish both.

With respect to disparate treatment, Plaintiff asserts that "Kulik admitted that two males remained on the [DC] job, but he made no effort to find Ms. Colpean another placement."  (Pl.'s Br. at 8).  Plaintiff does not respond to Defendant's argument that Plaintiff was not similarly situated to either Brady or Kode, or that the decision to end Plaintiff's assignment at DC was

made by DC – not Defendant.

With respect to intentional discrimination, Plaintiff does not identify any evidence that would establish that the person who discharged her, Kentry, was predisposed to discriminate against women and/or pregnant women, or that he actually acted on such a predisposition. Rather, she appears to base her intentional discrimination claim on the fact that DC representative Roek told her to start her maternity leave early. Plaintiff presents no evidence that Kentry, or any other decision maker at Defendant, was predisposed to discriminate against women and/or pregnant women.

Plaintiff also fails to address Defendant's legitimate nondiscriminatory reason for Plaintiff's discharge (i.e., that Plaintiff was discharged because Defendant did not have an assignment for her and to keep her on the bench was a drain on the company), other than to assert, without evidentiary support, that Defendant's "'elimination of position' argument runs contrary to the record."

The Court concludes that Plaintiff has failed to establish either type of prima facie claim of sex discrimination. In order to make a prima facie case with respect to intentional discrimination, Plaintiff must show "that the person who discharged h[er] was predisposed to discriminate against persons in the affected class and had actually acted on that predisposition in discharging [her]." *Singal,* 179 Mich. App. at 503. The undisputed evidence here establishes that DC employee Roek, not any representative of Defendant, asked Plaintiff to start her maternity leave early. It is also undisputed that Defendant's decision to terminate Plaintiff in December 2003 was made by McKenty. Plaintiff has not submitted any evidence to establish

11

that McKenty, or any other representative of Defendant, was predisposed to discriminating against women and/or pregnant women. Accordingly, Plaintiff cannot make a prima facie case of intentional discrimination.

Plaintiff's attempt to make a prima facie case of disparate treatment also fails. Plaintiff had not established that she is similarly situated to Brady or Cody. Moreover, even if she could, Plaintiff cannot identify how Defendant treated those non-protected employees differently for the same or similar conduct.

The Court therefore finds that Plaintiff has failed to make a prima facie claim of sex discrimination. In addition, Plaintiff has also failed to establish that Defendant's legitimate nondiscriminatory reason for Plaintiff's discharge is a pretext for discrimination. Defendant is therefore entitled to summary judgment on Plaintiff's sex discrimination claim on both of these challenged grounds.

B.   Plaintiff's FMLA Claim:

As explained in *Taylor v. Union Institute*, 30 Fed. Appx. 443, 452 (6th Cir. 2002), the FMLA creates prescriptive and proscriptive employee rights:

> The prescriptive rights created by the Act provide "entitlements" to employees and "set floors for employer conduct." To prevail on the basis of the Act's prescriptive rights, the plaintiff need not show that she was treated worse than other employees, just that she was denied the Act's entitlements. Proscriptive rights, on the other hand, prohibit disparate employer conduct with regard to employees taking leave.

*Id.* Thus, "[t]here are two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. §2615(a)(1); and (2) the 'retaliation' or

'discrimination' theory arising from 29 U.S.C. §2615(a)(2)." *Smith v. Aco, Inc.*, 368 F.Supp.2d 721, 731 (E.D. Mich. 2005).

Plaintiff states that she "only[3] alleges that Defendant Ajilon interfered with her rights under the FMLA. Specifically, Defendant Ajilon interfered with her right to be restored to the equivalent position after returning from her maternity leave." (Pl.'s Br. at 11).

To establish a claim of interference with FMLA rights, a plaintiff must show that: 1) she is an eligible employee); 2) the defendant is an employer as defined by the statute; 3) the employee was entitled to leave under the FMLA; 4) the employee gave the employer notice of his intention to take leave as required by 29 U.S.C. §2612(e)(1); and 5) the employer denied the FMLA benefits to which he was entitled or interfered with her FMLA rights. *Cavin v. Honda of America Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2004).

Here, Plaintiff claims that Defendant interfered with her FMLA rights by failing to restore her to an equivalent position when she returned from her maternity leave.

The FMLA not only allows an eligible employee to take up to twelve weeks of leave, "but also creates the concomitant right for an employee who has taken leave 'to be restored by the employer to the position of employment held by the employee when the leave commenced.'" *Hoge v. Honda of America Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004). 29 U.S.C. §2614(a) describes the FMLA restoration right and provides, in relevant part, that:

> Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave

---

[3]Thus, Plaintiff has waived any claim in this action under a retaliation or discrimination theory.

> shall be entitled, on return from such leave–
>
> (A) to be restored by the employer to the **position of employment held by the employee when the leave commenced**; or
>
> (B) to be restored to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.

*Id.* (emphasis added). "An 'equivalent position' under 29 U.S.C. §2614(a)(1)(B) is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority." *Id*. (Quoting 29 C.F.R. §825.215(a)). [4]

Defendant notes that Plaintiff alleges it violated the FMLA by failing to restore her to work at DC after she returned from her leave. Defendant contends that Plaintiff's FMLA claim fails because the FMLA does not require that Plaintiff be returned to an active assignment. It asserts that the FMLA only requires that the employer return an employee who takes leave to her former position or an equivalent position with the same pay, benefits, and working conditions as she had at the time she went on leave. Defendant maintains this is precisely what happened to Plaintiff when she returned from leave – she was returned to the position she held when her leave

---

[4] "There are a few limitations (sometimes referred to as exceptions) on an employee's right to restoration upon timely return from FMLA leave under §2614(a)," including that "the substantive right is not absolute because the right established 'shall [not] be construed to entitle any restored employee to . . . any right, benefit, or position or employment other than right, benefit or position to which the employee would have been entitled had the employee not taken the leave.'" *Id.* (Quoting 29 U.S.C. §2614(a)(3)(B)). Thus, an "employee returning from FMLA leave is not entitled to restoration unless he would have continued to be employed if he had not taken FMLA leave. For instance, an employer need not restore an employee who would have lost his job or been laid off even if he had not taken FMLA leave." *Id.*

14

began. Defendant asserts that when Plaintiff went on leave, she was on a non-assignment status with Defendant and that when she returned from her leave on November 10, 2003, she was returned to a non-assignment status. Defendant also asserts that the position Plaintiff returned to following her leave (non-assignment status but receiving bench pay) was actually better than the position she held when she left (non-assignment status without pay).

In response, Plaintiff continues to assert that when she returned from leave Plaintiff should have been restored to her assignment with DC. Plaintiff asserts that her non-assignment bench status is not equivalent to her previous assignment with DC. Plaintiff does not respond to Defendant's argument, or the evidence it submits in support of that argument, that when Plaintiff actually went on maternity leave on September 21, 2003,[5] she was on unpaid, non-assignment status with Defendant. Thus, Plaintiff has not submitted any evidence to contradict that as of the date she went on maternity leave in September, 2003, she was already on unpaid, non-assignment status with Defendant.

A fair reading of Plaintiff's deposition indicates that she testified that after her assignment at DC ended at the end of August, 2003, she was in a non-pay status, in that she was not on the bench, and was not being paid by Defendant because she had no assignment. Plaintiff also testified that after her assignment at DC ended, there was a period of a week or two that she was available and able to take an assignment with another client, if Defendant had located one and that she was told that she could either "take leave without pay until [her] maternity leave

---

[5]At the hearing, Plaintiff's counsel stated that Plaintiff began her maternity leave on September 23, 2003. The Court reaches the same conclusion regardless of whether Plaintiff began her maternity leave on September 21, 2003 or September 23, 2003.

started or [she] could take vacation time." (Pl.'s Dep. at 36-37).

Thus, Defendant's position that Plaintiff was in a non-assignment, non-paid status when she began her leave is supported by record evidence. Accordingly, because Defendant returned her to a non-assignment status with pay when she returned from her leave in November 2003, Plaintiff cannot establish that Defendant failed to restore her to the position she held when her leave commenced, or an equivalent position.

Accordingly, Defendant is entitled to summary judgment with respect to Plaintiff's FMLA claim.

C.  <u>After-Acquired Evidence Defense:</u>

The after-acquired evidence doctrine applies to bar an employee from obtaining certain remedies in a discrimination or FMLA[6] case. *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1168 (6th Cir. 1996). Where an employer can show it would have been entitled to terminate the employee for severe wrongdoing, if it had known of the employee's wrongdoing at the time, the employee's remedies are limited. *Id*. Where an employer seeks to reply upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge. *Id*. "As a general rule, under the after acquired evidence doctrine the employee is barred from obtaining front pay and reinstatement, and

---

[6] The Sixth Circuit has acknowledged that the after-acquired evidence rule also applies in FMLA cases. *Bila v. Radioshack Corp.*, 2004 WL 2713270 at *14 (E.D. Mich. 2004)(citing *Bauer v. Varity Dayton-Walther Corp.*, 118 F.3d 1109, 1112 (6th Cir. 1997)).

16

backpay is limited." *Id.; see also Starnes v. JLQ Auto. Svs. Co.,* 442 F.Supp.2d 416, 428 (E.D. Mich. 2006).

In its motion, Defendant asks the Court to rule that it is entitled to summary judgment with respect to both of Plaintiff's claims. It also seeks an additional ruling that Plaintiff's damages in this action would be limited under the after-acquired evidence defense doctrine even if she could proceed with her claims. Defendant asserts that Plaintiff would be barred from obtaining front pay or reinstatement because of her conduct discovered during this case.

Defendant contends that it learned during discovery that Plaintiff was working full time for one of its competitors while she was still employed by Defendant and was receiving bench pay. Defendant submits evidence that it had a "hard and fast" rule of termination for such conduct and that if it had been aware of that conduct, it would have immediately terminated Plaintiff. (*See* Kulik Dep. at 79-81). Defendant also asserts that Plaintiff lied about her grade point average on her employment action and asserts that conduct would also be grounds for termination.

Plaintiff's only response to Defendant's after-acquired evidence defense is to assert that Plaintiff "could read the writing on the wall and she began to undertake her own efforts to secure employment. For Ajilon to call this 'misconduct' is to distract attention from its clear violations of ELCRA and the FMLA." (Pl.'s Response at 5).

The Court concludes that the evidence submitted by Defendant relating to her dual employment entitles Defendant to the relief it requests under the after-acquired evidence defense.

Plaintiff admits that she starting working full time for one of Defendant's competitors

17

while she was employed by, and paid by, Defendant. She also acknowledges that she understood that during the period of time that she was employed with Defendant she could not work for anybody else, and that she was obligated to notify Defendant if she began working for someone else. Nevertheless, she never told Defendant that she had secured employment with Trialon. Defendant has submitted evidence to establish that Defendant would have immediately fired Plaintiff for that conduct, and Plaintiff has made no attempt to refute that evidence.

Accordingly, the Court rules that, even if Plaintiff could proceed with her claims in this action, she would be precluded from being awarded front pay or reinstatement in any event.

## CONCLUSION & ORDER

For the reasons above, **IT IS ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED** and this action is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: March 30, 2007

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 30, 2007, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager